IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL DAVILA, | No. C 05-4614 SI (pr) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| JAMES YATES, Warden, | |
| Respondent. | |

## INTRODUCTION

This matter is now before the court for consideration of the merits of Russell Davila's pro se petition for writ of habeas corpus concerning his 2001 conviction in Santa Clara County Superior Court. For the reasons discussed below, the court will deny the petition.

## BACKGROUND

A.  Procedural History of the Case

Davila was convicted in Santa Clara County Superior Court of grand theft (Cal. Penal Code § 487a) and fraudulent use of a contractor's license number (Cal. Bus & Prof. Code § 7027.3). He was found to have suffered five prior convictions and was sentenced to 50 years to life in prison under the Three Strikes law (Cal. Pen. Code §§ 667, 667.5, 1170.12). Davila appealed to the Court of Appeal, which reversed the grand theft conviction and, in an unpublished opinion, remanded for resentencing. The judge resentenced Davila to 25 years to

life on the remaining charge of fraudulent use of a contractor's license number. On appeal again, the Court of Appeal affirmed the judgment and sentence in an unpublished opinion. The California Supreme Court denied the petition for review. Davila then filed this action, alleging his sentence was cruel and unusual punishment and that California's statutory scheme proscribing fraudulent use of professional licenses violates his right to equal protection of the laws.

B.   Current Crime

The California Court of Appeal stated the relevant facts as follows:

> On April 30, 2000, while defendant was working at Home Depot, he met Lester and Lila Gee. The Gees mentioned that they needed to have their house painted and defendant offered to do the job for $250. They arranged to meet later to discuss the work.
>
> On May 7, 2000, Mr. Gee again met with defendant at Home Depot. Defendant introduced Mr. Gee to Steve Newman, a painter. Defendant and Newman went with Mr. Gee to Mr. Gee's home to assess the work that needed to be done.
>
> While at the Gees' home, Newman offered to paint the Gee home, and the Gees accepted the offer. In a separate bid, defendant offered to pave Mr. Gee's driveway for $2,500. Mr. Gee agreed to that price. After it was agreed that defendant would perform the paving work, defendant told the Gees that he was licensed as a paving contractor and had some equipment. Defendant gave the Gees a business card that read: "Russell Davila, Asphalt and Parking Improvement." The business card also listed a license number.
>
> Later that afternoon, Newman and defendant returned to the Gee home. Defendant provided the Gees with an invoice, which noted the paving price of $2,500, and requested $750 up front. Mrs. Gee wrote defendant a check for $750. Defendant asked the Gees to write "donation for kids" on the check because he said he would be using the money to help needy children. Defendant promised to deliver the materials and begin work the next day.
>
> Defendant subsequently gave the Gees a contract for the paving job, which listed $2,500 as the price for the project. The contract stated that the $750 was "a down payment for the cost fees on overcoat and other M-E-D." At the end of the contract, it was provided: "Thank you for your time, with respect subtotal $2,500.00, half down, $750.00 [sic], other half on completion, report submitted, Russell Davila." The contract did not identify a date by which the work was to be completed. Mr. Gee believed the financial incentive to be paid when the work was done was enough motivation to compel defendant to finish the work.
>
> Defendant was at the Gee home on May 8, 9, and 10, 2000, but did not perform any paving work. On May 11, 2000, Mr. Gee's bank called and asked Mr. Gee to authorize the $750 check to defendant. Mr. Gee authorized payment even though he had not seen any equipment, supplies, or progress on the paving.
>
> On May 16, 2000, defendant visited Mr. Gee at his office and said he needed additional money. Mr. Gee asked defendant if he still had the $750. Defendant said that he did. Mr.

Gee said that if defendant needed more supplies, then Mr. Gee would go with defendant to purchase them. Mr. Gee was concerned about whether the work would ever get done.

On May 21, 2000, defendant returned a camera he had borrowed from the Gees. On May 22, 2000, defendant spoke with Mr. Gee and said he had dropped off paving equipment near the Gee home. Mr. Gee never saw any equipment. During the next five days, Mr. Gee tried to reach defendant by telephone but was unable to reach him or leave a message. Newman also tried to reach defendant but was unable to do so.

Newman painted the Gee house in seven days. The Gees were pleased with his work and referred him to their friends.

On June 1, 2000, Mrs. Gee telephoned defendant's parole agent. Defendant's parole agent contacted a district attorney's investigator and provided her with the business card from defendant. The investigator discovered the defendant had no contracting license. Two weeks later, defendant was arrested at the roofing company where he was working.

When defendant's motel room was searched, a work-up of an asphalt job for the Gee home was found. The investigator also discovered forms for applying for a contractor's license.

Cal. Ct. App. Opinion, pp. 2-4

C.   Criminal History

Davila was sentenced under California's Three Strikes law[1] and received a longer sentence because he was found to have suffered at least two prior convictions that counted as strikes under the law.

Davila's prior strike convictions were three violations of Cal. Penal Code § 288(a), lewd and lascivious acts on a child under age 14, and two violations of § 288(b)(1), forcible lewd and lascivious acts on a child under age 14. He committed these acts on two of his natural children (a three year-old girl and a five year-old boy) and three of his stepchildren, ages 8, 10, and 13. Three of the children, including the three year-old girl, tested positive for gonorrhea, which they received from Davila. At the time of the investigation and arrest, Davila was under court order to stay away from the residence where his wife and children lived, but continued to see them and committed the child molesting crimes. Report of Probation Officer, Nov. 29, 2001, pp. 6-10.

---

[1] California's Three Strikes law consists of two almost identical statutory schemes – one adopted by initiative and the other passed by the Legislature – that allow harsher sentences for defendants who are convicted of felonies and have previously been convicted of one or more serious or violent felonies. See Cal. Penal Code §§ 667, 667.5, and 1170.12.

3

In addition to these prior felonies, Davila had also been convicted of numerous misdemeanors. He had 14 convictions for using or being under the influence of a controlled substance, two each for petty theft and driving without a license, and one each for receiving stolen property, vandalism, and possession of lost property.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for Davila's Eighth Amendment and equal protection claims.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

A.  The 25-to-Life Sentence Was Not Cruel and Unusual Punishment

A criminal sentence that is significantly disproportionate to the crime for which the defendant was convicted violates the Eighth Amendment's proscription against cruel and unusual punishment. See Solem v. Helm, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates Eighth Amendment). "[O]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences will be exceedingly rare." Id. at 289-90 (citation and quotation marks omitted). "'The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.'" Ewing v. California, 538 U.S. 11, 23 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)). Under this proportionality

5

1 principle, the threshold determination for the court is whether petitioner's sentence is one of the
2 rare cases in which a comparison of the crime committed and the sentence imposed leads to an
3 inference of gross disproportionality. Harmelin, 501 U.S. at 1005; Ewing, 539 U.S. at 30-31
4 (applying Harmelin standard).  Only if such an inference arises does the court proceed to
5 compare petitioner's sentence with sentences in the same and other jurisdictions. See Harmelin,
6 501 U.S. at 1005; cf. Ewing, 538 U.S. at 23.  The threshold for an "inference of gross
7 disproportionality" is quite high. See, e.g., id. at 30 (sentence of 25 years to life for conviction
8 of grand theft (for shoplifting three golf clubs) with prior convictions was not grossly
9 disproportionate); Harmelin, 501 U.S. at 1008-09 (mandatory sentence of life without possibility
10 of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross
11 disproportionality).

12 In determining whether the sentence is grossly disproportionate under a recidivist
13 sentencing statute, the court looks to whether such an "extreme sentence is justified by the
14 gravity of [an individual's] most recent offense and criminal history." Ramirez v. Castro, 365
15 F.3d 755, 768 (9th Cir. 2004); see Ewing, 538 U.S. at 28.  In judging the appropriateness of a
16 sentence under a recidivist statute, a court may take into account the government's interest not
17 only in punishing the offense of conviction, but also its interest "'in dealing in a harsher manner
18 with those who [are] repeat[] criminal[s].'" United States v. Bland, 961 F.2d 123, 129 (9th Cir.)
19 (quoting Rummel v. Estelle, 445 U.S. 263, 276 (1980), cert. denied, 506 U.S. 858 (1992).  The
20 Eighth Amendment does not preclude a state from making a judgment that protecting the public
21 safety requires incapacitating criminals who have already been convicted of at least one serious
22 or violent crime, as may occur in a sentencing scheme that imposes longer terms on recidivists.
23 See Ewing, 538 U.S. at 25 (upholding 25-to-life sentence for recidivist whose current conviction
24 was for grand theft (for shoplifting three golf clubs)); Rummel, 445 U.S. at 284-85 (upholding
25 life sentence with possibility of parole for recidivist convicted of fraudulent use of credit card
26 for $80, passing forged check for $28.36 and obtaining $120.75 under false pretenses); Bland,
27 961 F.2d at 128-29 (upholding life sentence without the possibility of parole for being a felon
28

6

in possession of a firearm with thirteen prior violent felony convictions, including rape and assault).

The standard of review in § 2254(d) presents an additional problem for habeas petitioners asserting Eighth Amendment sentencing claims. In Lockyer v. Andrade, 538 U.S. 63, 72-73 (2003), the Court rejected the notion that its case law was clear or consistent enough to be clearly established federal law within the meaning of 28 U.S.C. § 2254(d), except that it was clearly established that a gross disproportionality principle did apply to sentences for terms of years (as well as to the death penalty). However, the precise contours of that principle "are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." Id. at 73, quoting Harmelin, 501 U.S. at 1001.

Although Andrade and Ewing seemed to shut the door on most Eighth Amendment sentencing claims from Three Strikes defendants, the Ninth Circuit opened it again in Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004) and Reyes v. Brown, 399 F.3d 964 (9th Cir. 2005).

In Ramirez, the Ninth Circuit held that a 25-to-life sentence was grossly disproportionate to the crime committed where the current crime was petty theft with a prior theft-related conviction and the two prior strike convictions were robbery convictions. The current crime was the shoplifting of a $199 VCR, normally a misdemeanor but charged as a felony only because Ramirez had a prior theft-related conviction. Because the current shoplifting episode was nonviolent and did not threaten "'to cause grave harm to society,'" the crime alone would not justify the 25-to-life sentence. See Ramirez, 365 F.3d at 768 (quoting Harmelin, 501 U.S. at 1003). Even adding Ramirez's prior convictions into the mix did not justify the harsh sentence because Ramirez's "prior criminal history is comprised solely of two 1991 convictions for second-degree robbery obtained through a single guilty plea, for which his total sentence was one year in county jail and three years probation." Id. The court deemed the priors "nonviolent" because the force in one shoplifting episode was an accomplice driving over the foot of a security guard as they fled and the force used in the other shoplifting episode was Ramirez pushing a security guard out of his way as he fled the store. Id. The court also felt that the

minimal nature of these crimes was shown by the one-year jail sentence offered in exchange for a guilty plea, which was far less than the 2, 3, or 5 years' imprisonment allowable under the statute. Id. at 768-69. Another factor considered was that the jail sentence was the only period of incarceration ever imposed before the current sentence. Id. at 769. And Ramirez's criminal past paled in comparison to that in Solem, Ewing, and Andrade, where the defendants had been repeatedly in and out of prison, had received substantial sentences, and had been convicted of multiple felonies. Ramirez, 365 F.3d at 769. Moreover, Ramirez's criminal history was minimal compared to statewide averages for Three Strikes offenders. Id. Ramirez obtained habeas relief on his Eighth Amendment claim.

In Reyes v. Brown, 399 F.3d 964 (9th Cir. 2005), the Ninth Circuit considered a 26-to-life sentence for a petitioner whose current conviction was for perjury for making misrepresentations on a DMV driver's license application when he impersonated a friend. His prior convictions were a 1981 residential burglary conviction committed as a juvenile and a 1987 armed robbery conviction. The Reyes court seemed to examine the current and past convictions separately, to determine whether either alone justified the harsh sentence, rather than looking at the whole picture of past and current crimes together. See id. at 967 (describing analysis in Ramirez as first "conclud[ing] that Ramirez' sentence did not match the gravity of the triggering offense" and then "next consider[ing] Ramirez' criminal history to determine whether the extreme sentence matched his prior offenses"). In Reyes, the court gave almost no weight to the prior burglary conviction because the crime was committed when Reyes was a juvenile and resulted in just a 2-year sentence at the California Youth Authority. Reyes was released after serving just one year of the sentence, and the crime seemed nonviolent to the court because the "little detail in the record suggests that Reyes was 'at some guy's house with some friends and . . . walked out with a radio that didn't belong to' him." Id. at 968 n.5 (citation omitted); see id. at 969 ("given that Reyes' first strike was earned as a juvenile, the gravity of his offenses in total rests heavily on his 1987 armed robbery conviction.") Reyes' 1987 armed robbery prior conviction

was the "sticking point in this case," as it had resulted in a 9-year sentence (of which Reyes served 5 years) and there was inadequate information in the record to determine the facts of the armed robbery. Id. at 968-69. Reyes also appeared to downplay the evidence of other criminal activity by the defendant who had a history of non-strike and nonviolent offenses – including petty theft, being under the influence of a controlled substance, misdemeanor DUI, and misdemeanor battery – the severity of which decreased over time. Id. at 969 n.6. The court remanded the case for the district court to develop the record because "the circumstances under which Reyes committed the robbery are not sufficiently developed in the record for us to determine whether the offense was a 'crime against a person' or involved violence." Id. at 969. The implication was that if the armed robbery turned out to be a less serious crime, Reyes should be granted habeas relief.

In between Ramirez and Reyes, the Ninth Circuit decided another Three Strikes case and upheld a 25-to-life sentence as constitutional. See Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004). Rios shoplifted two watches having a combined value of $79.88, was chased by a loss prevention officer and was apprehended in the store parking lot after a minor struggle. Id. at 1083. Rios' current conviction was for petty theft with a prior theft-related conviction and second degree commercial burglary. His two strike convictions were from a 1987 guilty plea to two counts of robbery. The court determined that "Ewing and Andrade compel the conclusion that Rios's sentence was not grossly disproportionate to his crime in light of his criminal history." Rios, 390 F.3d at 1086. The court considered Rios' real sentence to be lighter than that imposed in Andrade because Rios had to serve only 25 years while the Andrade defendant had to serve 50 years before being eligible for parole – a difference resulting from the fact that one of Rios' two 25-to-life sentences was stayed and neither of Andrade's sentences was stayed. Rios, 390 F.3d at 1086. The court found Ramirez distinguishable: "unlike the defendant in Ramirez, Rios struggled with the loss prevention officer and tried to avoid apprehension. Additionally, his prior robbery 'strikes' involved the threat of violence, because his cohort used

1  a knife. As did the defendants in Ewing and Andrade..., Rios has a lengthy criminal history,
2  beginning in 1982, and he has been incarcerated several times." Rios, 390 F.3d at 1086. Rios'
3  25-to-life sentence did not offend the Eighth Amendment under the circumstances. See id.

4       Davila's sentence of 25-to-life is undoubtedly a harsh sentence, as he must serve a full
5  25 years before he is eligible for parole. Conviction solely for fraudulent use of a contractor's
6  license number would never warrant such a sentence by itself, but Davila is subject to the Three
7  Strikes law, dramatically increasing the mandatory sentence for a third felony offense.
8  Comparing the two leading cases on proportionality, Andrade and Ewing, with the facts
9  presented here, Davila's crime is as serious, if not more so, than the shoplifting crimes at issue
10 in those two cases, because it required an intent to defraud. And in both Andrade and Ewing,
11 the sentences were upheld.

12      Davila received a long sentence because he was a recidivist, and his recidivist nature must
13 be considered in evaluating the constitutionality of his sentence. Ramirez dictates that "because
14 [the defendant] was sentenced as a recidivist under the Three Strikes law, 'in weighing the
15 gravity' of his offense in our proportionality analysis, 'we must place on the scales not only his
16 current felony,' but also his criminal history." Ramirez, 365 F.3d at 768 (quoting Ewing, 538
17 U.S. at 29).

18      Davila's current felony was not a violent crime and was economic in nature. It involved
19 planning and preparation, evidenced by the false contractor's license number on Davila's
20 business card, a half-completed application for a contractor's license found in Davila's motel
21 room, and the fact that Davila wanted the victim to write "donation for kids" on the personal
22 check. Cal. Ct. App. Opinion, pp. 2-4. This all occurred within one month of Davila's release
23 from prison. Id. at 11.

24      In his petition, Davila compares his case to Solem v. Helm, 463 U.S. 277 (1983), arguing
25 that his offense was similar to Helm's crime, uttering a "no account" check for $100, and that
26 therefore, his sentence is disproportionate. Id. at 281. However, the Court in Solem noted that

10

"Helm's crime was 'one of the most passive felonies a person could commit.'" Id. at 296 (citation omitted). In contrast, Davila engaged in a more active enterprise of deception, including putting his false contractor's number on his business cards and on the contract for work. The Solem Court also observed that Helm's "prior offenses, although classified as felonies, were all relatively minor." Id. at 296-7. Davila stands in stark contrast to Helm, in that Davila's prior convictions were for serious crimes; Davila also has the possibility of parole, which was not available to Helm. Id. at 282. Additionally, Solem did not overrule Rummel v. Estelle, where the Court upheld a life sentence (with the possibility of parole) of a recidivist convicted of obtaining $120.75 under false pretenses; the defendant's prior felony convictions were for fraudulent use of a credit card for $80 and passing a forged check for $28.36. 445 U.S. 263, 265-6 (1980). Rummel shows that economic crimes, in addition to violent or other serious crimes, may be punished harshly, and that Davila's sentence comports with the Eighth Amendment.

Davila's criminal history includes five strike convictions (albeit from a single case) for numerous and repeated sexual molestations of his two natural children and three stepchildren. These are violent crimes. See Cal. Penal Code §§ 667(d)(1), 667.5(c)(6). Furthermore, three of the five abused children contracted gonorrhea as a result of Davila's abuse. Cal. Ct. App. Opinion, p. 11. Davila clearly has a more serious and extensive criminal record than the defendants in Ramirez, Rios, and Reyes.

Unlike the defendant in Ramirez, who had never served a prison term and only received a single year of county jail time, Davila has spent a great deal of time incarcerated in county jails and state prison (including over 10 years served on the 18-year sentence for child molesting). He had been out of prison less than a month when he committed the licensing offense; as the trial judge phrased it at Davila's sentencing, "Mr. Davila has not conducted himself in a manner that suggests a law-abiding future." October 16, 2003, RT 12. Most importantly, Davila's criminal history was violent, unlike that of the defendant in Ramirez. And it involved more violence than

11

potentially existed in Reyes.

If one also considers Davila's non-strike prior convictions, the picture does not improve. Davila has numerous misdemeanor convictions, including 14 for using or being under the influence of a controlled substance. He also has two convictions for petty theft, two for driving without a license, and one each for receiving stolen property, vandalism, and possession of lost property. Report of Probation Officer, November 29, 2001, p. 10.

When viewed in the light of his criminal history and current felony offense, Davila's is not that "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Ewing, 538 U.S. at 30 (quoting Harmelin, 501 U.S. at 1005).

The California appellate court's rejection of Davila's claim was not contrary to or an unreasonable application of clearly established federal law, as determined by the U. S. Supreme Court. The court reasonably concluded the sentence was not unconstitutionally disproportionate in light of Davila's current offense and criminal history. Cal. Ct. App. Opinion, p. 10. Therefore, Davila is not entitled to the writ on his Eighth Amendment claim.

B.     The Equal Protection Claim

Davila asserts that California's criminal statutes for professional licensing fraud violate his right to equal protection of the laws, in that his crime (contracting fraud) is a felony, but the other professional licensing crimes, such as practicing medicine or dentistry without a license, are only misdemeanors.[2] He contends that the various licensing crime defendants are similarly situated and there is no rational basis for treating a contractor more harshly than other licensing defendants.

---

[2] Licensing crimes are found in the California Business and Professions Code, and include impersonating physicians (§ 2054), dentists (§§ 1700, 1771), architects (§ 5536(a)), opticians (§ 2556), pharmacists (§ 4322), and nurses (§ 2799). All of these crimes are misdemeanors. The unauthorized practice of law is similarly a misdemeanor (§ 6126(a)).

12

The Court of Appeal found that persons charged with fraudulent use of a contractor's license are similarly situated to persons charged with violations of the other professional licensing statutes. Cal. Ct. App. Opinion, p. 6. The state has the same purpose of protecting the public from fraud and potential harm from persons falsely holding themselves out as professionals, regardless of the particular profession. Id. at 5-6. The court determined that rational basis was the appropriate constitutional test, and that "defendant fail[ed] to satisfy his burden." Id. at 7. The court found persuasive the fact that the Legislature had raised the penalty for fraudulent use of a contractor's license while retaining a separate misdemeanor of contracting without a license (Cal. Bus. & Prof. Code § 7028). The court saw two related rational bases for the statutory scheme: "the fact that there are two types of contracting violations in California demonstrates the Legislature's goal of providing flexibility in the charging of these crimes, as well as its intent to punish those who act with the intent to defraud more severely."[3] Id. at 8-9. The court expressed some misgivings about the apparent unfairness of the statutory scheme that made contractor fraud a felony while other licensing crimes were misdemeanors, but stated that it was "left with no other choice than to conclude that the classification of fraudulent use of a contractor's license as a felony is rationally related to a legitimate government purpose." Id. at 10.

The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). When state action implicates a fundamental right or involves a suspect classification, such as race, such a classification will "receive the strictest scrutiny under the Equal Protection Clause." Vieth v. Jubelirer, 541 U.S. 267, 293 (2004). When, as here, state action does not concern a suspect classification or a fundamental right, an equal protection violation may be established by demonstrating that the victim "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook

---

[3] None of the other professional licensing crimes require intent to defraud.

13

1  v. Olech, 528 U.S. 562, 564 (2000). In Plyler v. Doe, the Supreme Court addressed this issue
2  of being similarly situated:

> 3  The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the states. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the state to remedy every ill. In applying the equal protection clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

7  457 U.S. 202, 216 (1982)

8  Crucial to the equal protection analysis is the state's purpose in treating fraudulent use
9  of a contractor's license number differently from other licensing crimes, because "disparate
10 government treatment will survive rational basis scrutiny 'as long as it bears a rational relation
11 to a legitimate state interest.'" Squaw Valley Dev. Corp. v. Goldberg, 375 F.3d 936, 944 (9th
12 Cir. 2004), quoting Patel v. Penman, 103 F.3d 868, 875 (9th Cir. 1996).

13 As the Court of Appeal noted, the Legislature left in place the misdemeanor of
14 contracting without a license (Cal. Bus. & Prof. Code § 7028) when it passed the felony of
15 contractor fraud (Cal. Bus & Prof. Code § 7027.3). Cal. Ct. App. Opinion, pp. 8-9. The
16 existence of the two separate crimes shows that California authorities wanted to have different
17 tools to deal with different contractor license problems, depending on the circumstances of the
18 case. This goal of flexibility in charging crimes passes the low standard of the rational basis test,
19 as the Court of Appeal reasonably concluded. This flexibility also undermines Davila's
20 suggestion that the statutory scheme for licensing crimes treats all contractor impostors worse
21 than other professional impostors.

22 The legislative history of § 7027.3 also provides evidence of another legitimate state
23 interest for treating fraudulent use of a contractor's license differently. The report issued by the
24 California Senate Committee on the Judiciary clearly states the Legislature's purpose in raising
25 the penalty for fraudulent use of a contractor's license number from a misdemeanor to a
26 "wobbler." According to the bill's sponsors, in most of the cases where a person posed as a

14

contractor, a fraudulent contractor's license was used. S.B. 1468, 1984 Leg., Reg. Sess. (Cal. 1984). The report continues: "because the penalties are minor misdemeanor fines, the owners of the phony company will usually give a subordinate the money to pay the fine and compensate her for remaining silent as to the identity of the owners of the company." Id. The bill's sponsors made it clear that by increasing the penalty from a misdemeanor to a felony, they hoped to deter those subordinates from accepting the blame for the owners. Id. This is a legitimate state interest, reasonably advanced by the sentencing scheme, and creating such a scheme was within the "substantial latitude" granted to the state. Plyler, 457 U.S. at 216. The legislative history thus shows that classifying contractor fraud as a misdemeanor in California had been unsuccessful because the penalties were not sufficient to deter the crime. Defrauding parties had been treating the misdemeanor penalties as just another cost of doing business. The Legislature, in making contractor fraud a felony, intended the stiffer treatment to be a more effective deterrent to this particular crime. Among other things, front-line workers would not cover up for the real wrongdoers if the penalties were stiff enough. The felony classification for contractor fraud bears a rational relationship to the legitimate state interest of stopping this crime at the source and thereby protecting the consuming public.

Davila emphasizes that because the other professional licensing statutes are punishable only as misdemeanors, persons who violate those laws will escape meaningful punishment. He is incorrect. For example, a doctor impostor who injures a patient can be charged with a variety of crimes in addition to the licensing crime – anything from simple assault to mayhem to murder, such that there is little chance the defrauding party would go unpunished.

The Court of Appeal's rejection of Davila's equal protection claim was not contrary to or an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court. 28 U.S.C. § 2254(d)(1). The court reasonably applied equal protection principles, analyzed the state interests at issue, and concluded that there was no Fourteenth Amendment violation. Davila is not entitled to a writ on his equal protection claim.

**CONCLUSION**

The petition for writ of habeas corpus is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: July 5, 2006

_____
SUSAN ILLSTON
United States District Judge